Don Springmeyer (NV Bar #1021)
Michael J. Gayan (NV Bar #11135)
**KEMP JONES, LLP**
3800 Howard Hughes Pkwy., 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000
Email: *d.springmeyer@kempjones.com*
   *m.gayan@kempjones.com*

Sabita J. Soneji (*pro hac vice* forthcoming)
**TYCKO & ZAVAREEI LLP**
1970 Broadway – Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Email: *ssoneji@tzlegal.com*

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ALEXIS LOMAX,<br><br>*individually and on behalf of all others similarly situated*,<br><br>        Plaintiff,<br><br>    v.<br><br>T-MOBILE USA, INC.,<br><br>        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Alexis Lomax ("Plaintiff" or "Ms. Lomax"), individually and on behalf of all others similarly situated, through her undersigned counsel, alleges as follows against defendant T-Mobile USA, Inc. ("T-Mobile" or "Defendant"), based upon personal knowledge as to herself and, as to all other matters, upon information and belief, including her counsel's investigation. Ms. Lomax believes additional evidentiary support exists for her allegations, given an opportunity for discovery.

## I. INTRODUCTION

1. This class action arises out of a recent cyberattack and data breach ("Data Breach") involving T-Mobile's computer network and systems.

2. Through this Data Breach, an unauthorized actor gained access to T-Mobile's computer systems for nearly a month and stole a virtual treasure trove of personally identifiable information ("PII") of tens of millions of current, former, and prospective T-Mobile customers, including Ms. Lomax.

3. T-Mobile is responsible for allowing the Data Breach to occur because it failed to implement and maintain reasonable safeguards and failed to comply with industry-standard data security practices as well as federal and state laws and regulations governing data security, notwithstanding that T-Mobile knew it was a target for cyberattacks as it had experienced four other cyberattacks in the past four years.

4. Throughout the duration of the Data Breach, T-Mobile failed to, among other things, detect that ill-intentioned criminals had accessed its computer data and storage systems, notice the massive amounts of data that were compromised, or take any steps to investigate the red flags that should have warned T-Mobile that its systems were not secure. Had T-Mobile properly monitored its information technology infrastructure, it would have discovered the intrusion sooner.

5. T-Mobile had obligations created by, among other things, federal and state regulations regarding data security, industry standards, and common law to keep Ms. Lomax's and class members' PII confidential and to protect it from unauthorized access and disclosure.

6. PII compromised in the Data Breach includes at least names, drivers' license numbers, government identification numbers, Social Security numbers, dates of birth, T-Mobile prepaid PINs, addresses, and phone numbers.

7.     Ms. Lomax and class members provided their PII to T-Mobile with the reasonable expectation and mutual understanding that T-Mobile would comply with its obligations to keep such information confidential and secure from unauthorized access.

8.     T-Mobile's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches T-Mobile itself experienced in recent years.

9.     By obtaining, collecting, using, and deriving a benefit from Ms. Lomax's and class member's PII, T-Mobile assumed legal and equitable duties and knew or should have known that it was responsible for protecting Ms. Lomax's and class members' PII from disclosure.

10.     Ms. Lomax and class members have taken reasonable steps to maintain the confidentiality of their PII.

11.     Ms. Lomax and class members relied on T-Mobile to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

12.     As a result of T-Mobile's failure to protect the PII with which it was entrusted, Ms. Lomax's and class members' PII was accessed by malicious cyber criminals. Ms. Lomax and class members therefore have been exposed to and/or are at a significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future. They also suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. Ms. Lomax and class members have also lost the inherent value of their PII. This harm was compounded by T-Mobile's failure to ensure that its current, former, and prospective customers received proper and timely notification of the Data Breach.

13.     Accordingly, Ms. Lomax bring this action against T-Mobile seeking redress for its unlawful conduct and asserting claims for: (i) negligence; (ii) negligence *per se* ; (iii) declaratory judgment; (iv) breach of confidence; (v) breach of implied contract; and (vi) violations of Nevada's Deceptive Trade Practices Act.

/ / /

/ / /

## II.    PARTIES

14.    Plaintiff Alexis Lomax is a natural person who at all relevant times resided in and is a citizen of Las Vegas, Nevada. Ms. Lomax has been a customer of T-Mobile for about a year; she was previously a customer of Sprint, and her account was transitioned to T-Mobile after the two companies merged. She pays T-Mobile for cellular telephone service for the number (702) 813-XXXX. She entrusted PII, such as her name, address, date of birth, Social Security number, debit card information, and drivers' license information, to T-Mobile with the reasonable expectation and understanding that T-Mobile would protect, maintain, and safeguard that information from compromise, unauthorized disclosure, and misuse by unauthorized users, and reasonably expected timely notification of any data security incidents involving her PII should such occur. Had Ms. Lomax known that T-Mobile did not take appropriate measures to secure her PII, Ms. Lomax would not have provided her PII to Defendant, and would have sought cellular telephone services from a different company.

15.    Ms. Lomax has not previously been a victim of fraud or identity theft. Nor is Ms. Lomax aware of her Social Security Number, debit card information, or drivers' license information being compromised in other data breaches.

16.    On August 16, 2021, Ms. Lomax learned from public reporting that T-Mobile had experienced a data breach. Yet it was not until August 19, 2021, that Ms. Lomax received a text message from T-Mobile informing her that her information had been compromised in the Data Breach. T-Mobile also posted a notice on Ms. Lomax's online T-Mobile account, which informed her that her "name, date of birth, driver's license number, government identification numbers, and Social Security [taxpayer identification] numbers" were subject to unauthorized access in the Data Breach.[1]

17.    After receiving the August 19, 2021 text message from T-Mobile, Ms. Lomax became concerned that her stolen PII could be used by criminals to target her for identity theft and fraud. To mitigate against this substantial and impending risk of identity theft and fraud, on August

---

[1] A screenshot of this notification from Ms. Lomax's online T-Mobile account is attached as Exhibit A.

20, 2021, Ms. Lomax purchased enhanced credit monitoring and identity theft protection services from Experian, which cost $19.99 per month. Ms. Lomax made her first payment of $19.99 on or around August 20, 2021, and for the indefinite future will continue to incur this monthly cost as a result of the Data Breach.

18.     Additionally, as a result of the Data Breach, Ms. Lomax estimates that she has spent at least one hour monitoring her credit and other online accounts, as well as conducting internet research regarding the scope of the breach and the information compromised.

19.     Ms. Lomax has also suffered emotional anguish and distress, including but not limited to anxiety related to the breach of her sensitive PII.

20.     Defendant, T-Mobile USA, Inc., is a Delaware corporation headquartered at 12920 Southeast 38th Street, Bellevue, Washington 98006. Defendant is a publicly traded company organized and operated for the profit and financial benefit of its shareholders. As of January 1, 2021, Defendant had annual gross revenues of well over $60 billion. Defendant collects and maintains the personal information of millions of U.S. and Nevada consumers.

21.     Defendant's unlawful conduct was authorized, ordered, or performed by its directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Defendant's affairs. Defendant, through its subsidiaries, divisions, affiliates and agents, operated as a single unified entity with each acting as the alter ego, agent or joint-venturer of or for the other with respect to the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals and controlling parties.

### III.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).  The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because putative class members are citizens of a different state than T-Mobile.

23.     This Court has personal jurisdiction over T-Mobile because T-Mobile is authorized to conduct and does regularly conduct business in Nevada.

24.     Venue is proper in this District under 28 U.S.C. § 1391 because T-Mobile does business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## IV.     FACTUAL ALLEGATIONS

### A. T-Mobile and Its Privacy and Data Security Representations

25.     Through T-Mobile's Privacy Policy, available on its website, T-Mobile represents and warrants to its customers that it will protect their customers' PII, and additionally represents and warrants to its customers how it will use their customers' PII.

26.     T-Mobile's Privacy Policy represents to T-Mobile customers that (i) T-Mobile customers' PII is secure, (ii) T-Mobile will only disclose its customers' PII "with […] consent, which we may get in writing, online, or orally," and (iii) T-Mobile uses "administrative, technical, contractual, and physical safeguards designed to protect your data while it is under our control."[2]

27.     T-Mobile's Privacy Policy also provides detail on when and how T-Mobile may use its customers' PII, including when and how it will share its customers' PII with third parties. The Privacy Policy states that it may use its customers' PII to "[a]dvertise and market products and services from T-Mobile and other companies to you, including through targeted advertising and communications about promotions and events, contents, and sweepstakes"; and "[c]onduct research and create reports from analysis of things like usage patterns and trends and deidentify or aggregate personal data to create business and market analysis and reports."[3]

28.     The Privacy Policy further provides that, "starting on April 26, 2021", T-Mobile began "using some data we have about you, including information we learn from your web and device usage data (like the apps installed on your device) and interactions with our products and services, for our own and 3rd party advertising, unless you tell us not to."[4]

---

[2]  T-Mobile, *T-Mobile Privacy Notice* (May 5, 2021), available at https://www.t-mobile.com/privacy-center/our-practices/privacy-policy (last visited September 11, 2021).

[3] *Id.*

[4] *Id.*

29.     The Privacy Policy also represents that T-Mobile "works with third parties, including advertising networks, which collect information about you through devices, websites, and apps, serve ads for us and others, and measure their effectiveness. . . . For example, third parties like Google Ad Manager and Nielsen may use technology to collect data to deliver, personalize, and measure ads for some of our Products and Services. This technology allows tracking of device activity over time across online properties."[5]

30.     The Privacy Policy also informs T-Mobile customers that T-Mobile works "with analytic service providers like Google Analytics to help track your use of our products and services," and that "[i]f your mobile device is turned on, our network is collecting data about where it is. We may use, provide access to, or disclose this network location data without your permission to provide and support our services."[6]

31.     Notably, the Privacy Policy does *not* state that T-Mobile will share its customers' most sensitive PII with unauthorized third parties. Indeed, in providing an example of how it purports to safeguard its customers' PII, T-Mobile represents that "when you contact us by phone or visit us in our stores, we have procedures in place to make sure that *only the primary account holder or authorized users have access*."[7]

**B.  T-Mobile's Knowledge That It Was and Is a Target of Cyber Threats**

32.     T-Mobile knew that it was a prime target for hackers given the significant amount of its current, former, and prospective customers' sensitive PII processed through its computer data and storage systems.

33.     T-Mobile's knowledge is underscored by the massive number of publicly reported data breaches that have occurred in recent years, including numerous prior breaches of T-Mobile itself.

---

[5] *Id.*

[6] *Id.*

[7] *Id.* (emphasis added).

34.    According to reporting in the Washington Post, "dealing with data breaches is nothing new for [T-Mobile] — or its customers. For those keeping count, this is the fifth such incident the wireless carrier has suffered in the past three years, but according to Allie Mellen, a security and risk analyst at Forrester Research, this is 'the worst breach they've had so far.'"[8]

35.    In a December 2020 data breach, approximately 200,00 customers had their call logs stolen in another hacking incident.[9]

36.    In a March 2020 data breach that affected far fewer customers than the present Data Breach, hackers accessed a subset of the same data compromised in the present Data Breach through an attack on T-Mobile's email vendor.[10]

37.    In a November 2019 data breach, a smaller number of T-Mobile's pre-paid customers saw their PII subject to "malicious, unauthorized access."[11]

38.    In a 2018 data breach, the names, address, and birth dates of some 2 million T-Mobile customers were stolen by hackers.[12]

39.    Despite knowing the prevalence of data breaches, including multiple recent breaches directly affecting its own computer servers and data storage systems, T-Mobile failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access to their highly sensitive systems and databases. T-Mobile had the resources to prevent a breach, but it neglected to adequately invest in data security, despite the growing number of well-publicized data breaches and its own history with the same.

---

[8] Chris Velazco, *Here's what to do if you think you're affected by T-Mobile's big data breach*, Washington Post (August 19, 2021), *available at* https://www.washingtonpost.com/technology/2021/08/19/t-mobile-data-breach-what-to-do/ (last visited September 11, 2021).

[9] Cammy Pedroja, *T-Mobile Hacked for 5th Time in 4 Years in Latest Breach; Nearly 50 Million Affected*, Newsweek (August 18, 2021), *available at* https://www.newsweek.com/t-mobile-hacked-5th-time-4-years-latest-breach-nearly-50-million-affected-1620710 (last visited September 11, 2021).

[10] *Id.*

[11] *Id.*

[12] *Id.*

## C. The Data Breach

40.  T-Mobile states that "[o]n August 17, 2021, T-Mobile learned that a bad actor illegally accessed and/or acquired personal data. The bad actor first gained access to T-Mobile systems on or before July 19, 2021," and that T-Mobile "verified that . . . the data stolen from our systems did include some personal information."[13]

41.  According to T-Mobile, "[t]he exact personal information [stolen] varies by individual. The types of impacted information include names, drivers' licenses, government identification numbers, Social Security numbers, dates of birth, T-Mobile prepaid PINs (which have already been reset to protect you), addresses and phone number(s)."[14]

42.  T-Mobile has identified the following categories of victims whose PII was stolen in the Data Breach:

- "[I]nformation from approximately 7.8 million current T-Mobile postpaid customer accounts that included first and last names, date of birth, SSN, and driver's license/ID information was compromised. . . . [P]hone numbers, as well as IMEI and IMSI information, the typical identifier numbers associated with a mobile phone, were also compromised";

- "[A]nother 5.3 million current postpaid customer accounts . . . had one or more associated customer names, addresses, date of births, phone numbers, IMEIs and IMSIs illegally accessed";

- "[D]ata files with information from about 40 million former or prospective T-Mobile customers, including first and last names, date of birth, SSN, and driver's license/ID information, were compromised";

- "[A]n additional 667,000 accounts of former T- Mobile customers that were accessed with customer names, phone numbers, addresses and dates of birth compromised"; and

---

[13] T-Mobile, *Notice of Data Breach (Updated as of September 7, 2021)*, available at https://www.t-mobile.com/brand/data-breach-2021 (last visited September 11, 2021).

[14] *Id.*

- "[A]pproximately 850,000 active T-Mobile prepaid customer names, phone numbers and account PINs were exposed."

43.     As T-Mobile's CEO succinctly put it, "this individual's intent was to break in and steal data, and they succeeded."[15]

44.     A 21-year-old American living in Turkey, John Binns, has claimed responsibility for the T-Mobile Data Breach. He shared details of the Data Breach with the Wall Street Journal before they were widely known.[16]

45.     According to the Wall Street Journal, "Mr. Binns said he managed to pierce T-Mobile's defenses after discovering in July an unprotected router exposed on the internet. He said he had been scanning T-Mobile's known internet addresses for weak spots using a simple tool available to the public."[17]

46.     "Mr. Binns said he used that entry point to hack into the cellphone carrier's data center outside East Wenatchee, Wash., where stored credentials allowed him to access more than 100 servers."[18]

47.     Mr. Binns "said it took about a week to burrow into the servers that contained personal data about the carrier's tens of millions of former and current customers, adding that the hack lifted troves of data around Aug. 4."[19]

48.     Mr. Binns "uses the online names IRDev and v0rtex, among others" and, according to security research firm Unit221B LLC, "the IRDev alias was responsible for the T-Mobile hack

---

[15] Mike Sievert, *The Cyberattack Against T-Mobile and Our Customers*, T-Mobile (Aug. 27, 2021), available at https://www.t-mobile.com/news/network/cyberattack-against-tmobile-and-our-customers (last visited September 12, 2021).

[16] Drew FitzGerald and Robert McMillan, *T-Mobile Hacker Who Stole Data on 50 Million Customers: 'Their Security is Awful'*, Wall St. J. (Aug. 27, 2021), available at https://www.wsj.com/articles/t-mobile-hacker-who-stole-data-on-50-million-customers-their-security-is-awful-11629985105 (last visited September 11, 2021).

[17] *Id.*

[18] *Id.*

[19] *Id.*

because someone using this handle was reaching out to online criminals trying to sell the T-Mobile data before the hack had been made public."[20]

49.     Other reporting confirms that the data is being sold on underground forums frequented by cybercriminals. According to Motherboard, a division of Vice News, a "seller is asking for 6 bitcoin, [valued] around $270,000, for a subset of the data containing 30 million [S]ocial [S]ecurity numbers and drivers licenses. The seller said they are privately selling the rest of the data at the moment."[21]

50.     Mr. Binns told the Wall Street Journal that T-Mobile's "security is awful." And experts agree. Glenn Gerstell, a former general counsel for the National Security Agency, stated that T-Mobile did not employ "good data management practices."[22]

51.     These observations were echoed by other cybersecurity experts. According to Chris Clements, VP of Solutions Architecture at cybersecurity firm Cerberus Sentinel:

> The attacker claims to have compromised an end of life GPRS system that was exposed to the internet and was able to pivot from it to the internal network where they were able to launch a brute force authentication attack against internal systems with no rate limiting and I'm guessing no alerting functions either. **Assuming this is true, then as usual it isn't just one mistake that leads to a massive compromise, but a string of failures or absence of security controls that occur.**
>
> This is the type of incident that could have been identified as a risk by a properly scoped penetration test and detected with the use of internal network monitoring tools.[23]

52.     Unfortunately for Ms. Lomax and the tens of millions of other victims of T-Mobile's latest data breach, T-Mobile knew their data was at risk but still allowed this "string of failures" to occur due to an "absence of security controls."

---

[20] *Id.*

[21] Joseph Cox, *T-Mobile Investigating Claims of Massive Customer Data Breach*, Motherboard (Aug. 15, 2021), available at https://www.vice.com/en/article/akg8wg/tmobile-investigating-customer-data-breach-100-million (last visited September 11, 2021).

[22] FitzGerald, *supra* note 17.

[23] Ben Canner, *Continuing Expert Coverage of the T-Mobile Breach*, Endpoint Security Solutions Review (Aug. 18, 2021), available at https://solutionsreview.com/endpoint-security/continuing-expert-coverage-of-the-t-mobile-breach/ (last visited September 12, 2021).

**D. T-Mobile Failed to Comply with Statutory and Regulatory Obligations**

53. T-Mobile had obligations created by the FTC Act, industry standards, and common law to keep Ms. Lomax's and class members' PII confidential and to protect it from unauthorized access and disclosure.

54. T-Mobile was prohibited by the FTC Act (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

55. Moreover, federal agencies have issued recommendations and guidelines to temper data breaches and the resulting harm to individuals and financial institutions. For example, the FTC has issued numerous guides for business, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[24]

56. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[25] Among other things, the guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming

---

[24] Federal Trade Commission, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited September 12, 2021).

[25] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[26]

57.     Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[27]

58.     As noted above, T-Mobile failed to implement security controls that would satisfy even these minimum guidelines and industry standards.

59.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations, particularly for PII.[28]

60.     T-Mobile also failed to comply with commonly accepted industry standards for data security. Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

> a. Maintaining a secure firewall configuration;
>
> b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;
>
> c. Monitoring for suspicious or irregular traffic to servers;
>
> d. Monitoring for suspicious credentials used to access servers;
>
> e. Monitoring for suspicious or irregular activity by known users;

---

[26] *Id.*

[27] FTC, *Start With Security*, *supra* note 25.

[28] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited September 12, 2021).

f.   Monitoring for suspicious or unknown users;

g.   Monitoring for suspicious or irregular server requests;

h.   Monitoring for server requests for PII;

i.   Monitoring for server requests from VPNs; and

j.   Monitoring for server requests from Tor exit nodes.

61.     T-Mobile is also required by Nev. Rev. Stat. Ann. § 603A.210 to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure." Other states' laws and regulations similarly require T-Mobile to protect Ms. Lomax's and class members' PII, and further, to handle any breach of the same in compliance with applicable breach notification statutes.

62.     In addition to its obligations under federal and state laws, T-Mobile owed a duty to Ms. Lomax and class members whose PII was entrusted to T-Mobile to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.  T-Mobile owed a duty to Ms. Lomax and class members to provide reasonable security, consistent with industry standards and requirements, and to ensure that its systems and networks adequately protected Ms. Lomax's and class members' PII.

63.     T-Mobile owed a duty to Ms. Lomax and class members, whose PII was entrusted to T-Mobile, to design, maintain, and test its systems to ensure that the PII in T-Mobile's possession was adequately secured and protected.

64.     T-Mobile owed a duty to Ms. Lomax and class members, whose PII was entrusted to T-Mobile, to create and implement reasonable data security practices and procedures to protect the PII in its possession.

65.     T-Mobile owed a duty to Ms. Lomax and class members, whose PII was entrusted to T-Mobile, to implement processes that would detect a breach in its data security systems in a timely manner.

66.     T-Mobile owed a duty to Ms. Lomax and class members, whose PII was entrusted to T-Mobile, to act upon data security warnings and alerts in a timely fashion.

67.     T-Mobile owed a duty to Ms. Lomax and class members, whose PII was entrusted to T-Mobile, to disclose if its systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in their customers' decision to entrust it with PII.

68.     T-Mobile owed a duty to Ms. Lomax and class members, whose PII was entrusted to T-Mobile, to disclose in a timely and accurate manner when data breaches occur.

69.     T-Mobile owed a duty of care to Ms. Lomax and class members because they were foreseeable and probable victims of any inadequate data security practices.

70.     In this case, T-Mobile was fully aware of its obligation to use reasonable measures to protect the PII of its customers, acknowledging as much in its Privacy Policy.  T-Mobile also knew it was a target for hackers.  But despite understanding the consequences of inadequate data security, T-Mobile failed to comply with industry-standard data security requirements.

71.     T-Mobile's failure to employ reasonable and appropriate measures to protect against unauthorized access to its customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, and various state consumer protection and data breach statutes.

**E.  Effects of the Data Breach**

72.     It is well known that PII, including Social Security numbers, is a highly valued commodity and a frequent target of hackers.

73.     According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.[29]

74.     Consumers place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes significant negative financial impact on victims as well as severe distress and other strong emotions and physical reactions.

---

[29] Javelin Strategy & Research, *Identity Fraud Hits All Time High With 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study* (Feb. 6, 2018), available at https://www.javelinstrategy.com/press-release/identity-fraud-hits-all-time-high-167-million-us-victims-2017-according-new-javelin (last visited September 12, 2021).

75. Consumers are particularly concerned with protecting the privacy of their Social Security numbers, which is the "secret sauce" that is "as good as your DNA to hackers."[30]

76. There are long-term consequences to data breach victims whose Social Security numbers are taken and used by hackers.

77. Even if they know their Social Security numbers have been accessed, Ms. Lomax and class members cannot obtain new numbers unless they become a victim of Social Security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start."[31] And "[f]or some victims of identity theft, a new number actually creates new problems. If the old credit information isn't associated with your new number, the absence of any credit history under your new number may make it more difficult for you to get credit."[32]

78. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name, but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, seek unemployment or other benefits, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

79. PII is such a valuable commodity to identity thieves that, once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. And, as noted above, the criminal hacker(s) who stole Ms. Lomax's and class members' data is already selling that data on underground forums frequented by cybercriminals.

---

[30] Cameron Huddleston, *How to Protect Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 10, 2015), available at https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html (last visited September 12, 2021).

[31] Social Security Admin., Identity Theft and Your Social Security Number, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited September 12, 2021).

[32] *Id.*

80.     Thus, Ms. Lomax and class members must vigilantly monitor their credit reports, financial accounts, and other areas of concern for the foreseeable future.

81.     There may be a significant time lag between when PII is stolen and when it is actually misused.

82.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

83.     Accordingly, the two years of credit monitoring that T-Mobile offered victims of the Data Breach is woefully inadequate to guard against the risks they face.

84.     And, in any event, the two years of credit monitoring that T-Mobile offered victims of the Data Breach does nothing to compensate them for the damages they suffered as a result of the Data Breach.

85.     The risk of identity theft is particularly acute where detailed personal information is stolen, such as the PII that was compromised in the Data Breach.

86.     The cyber black-market demonstrates that PII is a valuable property right.[34] Moreover, its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts, which include heavy prison sentences. This obvious risk/reward analysis illustrates that PII has considerable market value.

---

[33] U.S. Government Accountability Office, *Report to Congressional Requesters* (June 2007), https://www.gao.gov/assets/gao-07-737.pdf  (last visited September 12, 2021)

[34] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to that of traditional financial assets.") (citations omitted).

87. The value of PII is underscored by the growing number of legitimate marketplaces allowing consumers to monetize their PII.[35]

88. As the result of the Data Breach, Ms. Lomax and class members have suffered or will suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

    a. identity theft and fraud resulting from theft of their PII;

    b. costs associated with the detection and prevention of identity theft and unauthorized use of their online accounts, including financial accounts;

    c. losing the inherent value of their PII;

    d. costs associated with purchasing credit monitoring and identity theft protection services;

    e. unauthorized access to and misuse of their online accounts;

    f. unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

    g. lowered credit scores resulting from credit inquiries following fraudulent activities;

    h. costs associated with time spent and the loss of productivity or enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, addressing other varied instances of identity theft – such as credit cards, bank accounts, loans, government benefits, and other services procured using the stolen PII, purchasing

---

[35] *Markers for personal data*, Project VRM, Harvard University, https://cyber.harvard.edu/projectvrm/VRM_Development_Work#Markets_for_personal_data (last visited September 12, 2021).

credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach;

i. the continued imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties; and

j. continued risk of exposure to hackers and thieves of their PII, which remains in T-Mobile's possession and is subject to further breaches so long as T-Mobile fails to undertake appropriate and adequate measures to protect Ms. Lomax and class members.

89.    Additionally, Ms. Lomax and class members place significant value in data security. According to a survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[36]

90.    One study on website privacy determined that U.S. consumers valued the restriction of improper access to their personal information – the very injury at issue here – between $11.33 and $16.58 per website. The study also determined that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US$30.49 – 44.62."[37] This study was done in 2002, almost twenty years ago. The sea-change in how pervasive the Internet is in everyday lives since then indicates that these values—when associated with the loss of PII to bad actors—would be much higher today.

---

[36] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 11, 2016), https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited September 17, 2021).

[37] Hann, Hui, *et al*, The Value of Online Information Privacy: Evidence from the USA and Singapore, at 17, Oct. 2002, *available at* https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited September 22, 2021).

91.     Ms. Lomax and class members face imminent risk of fraud, criminal misuse of their PII, and identity theft for years to come as result of the Data Breach and T-Mobile's deceptive and unconscionable conduct.

## V.     CLASS ACTION ALLEGATIONS

92.     Pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3), Ms. Lomax seeks certification of the following nationwide class:

> **Nationwide Class:** All residents of the United States of America whose PII was compromised in the Data Breach.

93.     The Nationwide Class asserts claims against T-Mobile for negligence (Count I), negligence *per se* (Count II), declaratory judgment (Count III), breach of confidence (Count IV), and breach of implied contract (Count V).

94.     Pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3), Ms. Lomax seeks certification of Nevada state claims in the alternative to the nationwide claims, as well as certification of claims for violations of Nevada's Deceptive Trade Practices Act (Count VI) on behalf of a subclass of Nevada residents, defined as follows:

> **Nevada Subclass:** All residents of Nevada whose PII was compromised in the Data Breach.

95.     The Nationwide Class and the Nevada Subclass are collectively referred to herein as the "Class."

96.     Excluded from the Class are T-Mobile, any entity in which T-Mobile has a controlling interest, and T-Mobile's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, members of their judicial staff, and any judge sitting in the presiding court system who may hear an appeal of any judgment entered.

97.     **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed Class includes tens of millions of members, there is significant risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for T-Mobile. For example, injunctive relief may be entered in multiple cases,

but the ordered relief may vary, causing T-Mobile to have to choose between differing means of upgrading its data security infrastructure and choosing the court order with which it will comply. Class action status is also warranted because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

98. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. T-Mobile has admitted that tens of millions of individuals were victims of the Data Breach.

99. **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include, but are not limited to:

    a.  Whether T-Mobile knew or should have known that its computer and data storage systems were vulnerable to attack;

    b.  Whether T-Mobile failed to take adequate and reasonable measures to ensure its computer and data systems were protected;

    c.  Whether T-Mobile owed a duty of care to Ms. Lomax and class members, as alleged above;

    d.  Whether T-Mobile breached the duties of care it owed to Ms. Lomax and class members;

    e.  Whether T-Mobile failed to take available steps to prevent and stop the Data Breach from happening;

    f.  Whether T-Mobile failed to disclose the material facts that it did not have adequate computer systems and security practices to safeguard PII;

    g.  Whether T-Mobile's failure to secure Ms. Lomax's and class members' PII in the manner alleged violated federal, state, and local laws and regulations, or industry standards;

h.  Whether T-Mobile was negligent in establishing, implementing, and following security protocols;

i.  Whether Ms. Lomax's and class members' PII was compromised and exposed as a result of the Data Breach and the extent of that compromise and exposure;

j.  Whether T-Mobile's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach, resulting in the unauthorized access to, compromise, and/or theft of Ms. Lomax's and class members' PII;

k.  Whether T-Mobile's conduct amounted to violations of state statutes, as alleged below;

l.  Whether, as a result of T-Mobile's conduct, Ms. Lomax and class members face a significant threat of harm and/or have already suffered harm, and, if so, the appropriate measure of damages to which they are entitled;

m.  Whether, as a result of T-Mobile's conduct, Ms. Lomax and class members are entitled to injunctive, equitable, declaratory and/or other relief and, if so, the nature of such relief;

n.  Whether Ms. Lomax and class members are entitled to compensatory damages; and

o.  Whether Ms. Lomax and class members are entitled to punitive damages.

100.  **Typicality. Fed. R. Civ. P. 23(a)(3).** Ms. Lomax's claims are typical of other class members' claims because Ms. Lomax and class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

101.  **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Ms. Lomax is an adequate representative of the Class. Ms. Lomax is a member of the Class. Ms. Lomax has no conflicts of interest with the Class. Ms. Lomax has retained counsel competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation and consumer protection claims. Ms. Lomax intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

102.    **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Class certification is also appropriate under Rule 23(b)(2). T-Mobile, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole. Moreover, T-Mobile continues to maintain its inadequate security practices, retains possession of Ms. Lomax's and class members' PII, and has not been forced to change its practices or to relinquish PII by nature of other civil suits or government enforcement actions, thus making injunctive and declaratory relief a live issue and appropriate to the Class as a whole.

103.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Ms. Lomax and the class members are relatively small compared to the burden and expense required to individually litigate their claims against T-Mobile, a sophisticated multinational corporation, and thus, individual litigation to redress T-Mobile's wrongful conduct would be impracticable. Individual litigation by each class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    CAUSES OF ACTION

### COUNT I

### *NEGLIGENCE*

**(On behalf of Plaintiff and the Nationwide Class or, in the alternative, on behalf of Plaintiff and the Nevada Subclass)**

104.    Ms. Lomax repeats the allegations in paragraphs 1 – 103 of this Complaint, as if fully alleged herein.

105.	T-Mobile owed a duty of care to Ms. Lomax and class members to use reasonable means to secure and safeguard the entrusted PII, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems, as alleged herein.

106.	These common law duties existed because Ms. Lomax and class members were the foreseeable and probable victims of any inadequate security practices in T-Mobile's affirmative development and maintenance of its data security systems.

107.	In fact, not only was it foreseeable that Ms. Lomax and class members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, T-Mobile knew that it was more likely than not Ms. Lomax and other class members would be harmed by such exposure and theft of their PII.

108.	T-Mobile's duties to use reasonable security measures also arose as a result of the special relationship that existed between T-Mobile, on the one hand, and Ms. Lomax and class members, on the other hand.

109.	This special relationship arose because Ms. Lomax and class members entrusted T-Mobile with their PII, as part of a process of obtaining cellular telephone and other essential services from T-Mobile.

110.	T-Mobile alone could have ensured that its data security systems and practices were sufficient to prevent or minimize the Data Breach.

111.	T-Mobile's duties to use reasonable data security measures also arose under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII.

112.	Various FTC publications and data security breach orders further form the basis of T-Mobile's duties.

113.	In addition, individual states have enacted statutes based on the FTC Act (some of which specifically incorporate the FTC Act's relevant duties), such as the Nevada Deceptive Trade Practices Act, that also created a duty.

114.    T-Mobile breached the aforementioned duties when it failed to use security practices that would protect the PII provided to it by Ms. Lomax and class members, thus resulting in unauthorized exposure and third party theft of Ms. Lomax's and class members' PII.

115.    T-Mobile further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Ms. Lomax's and class members' PII within its possession, custody, and control.

116.    As a direct and proximate cause of T-Mobile's failure to adequately develop and maintain its data security systems, and its failure to use appropriate security practices, Ms. Lomax's and class members' PII was exposed, disseminated, and made available to unauthorized third parties.

117.    T-Mobile admitted that Ms. Lomax's and class members' PII was wrongfully disclosed, accessed, and stolen as a result of the Data Breach.

118.    The Data Breach caused direct and substantial damages to Ms. Lomax and class members, as well as the likelihood of future and imminent harm through the dissemination of their PII and the greatly enhanced risk of credit fraud and identity theft.

119.    By engaging in the foregoing acts and omissions, T-Mobile committed the common law tort of negligence.

120.    For all the reasons stated above, T-Mobile's conduct was negligent and departed from reasonable standards of care including by, but not limited to: failing to adequately limit access to and protect the PII; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Ms. Lomax's and class members' PII.

121.    But for T-Mobile's wrongful and negligent breach of its duties owed to Ms. Lomax and class members, their PII would not have been compromised.

122.    Neither Ms. Lomax nor class members contributed to the Data Breach or subsequent misuse of their PII as described in this Complaint.

123.    As a direct and proximate result of T-Mobile's negligence, Ms. Lomax and class members have been injured and are entitled to damages in an amount to be proven at trial. Such

injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by T-Mobile, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

**COUNT II**

***NEGLIGENCE* PER SE**

**(On behalf of Plaintiff and the Nationwide Class or, in the alternative, on behalf of Plaintiff and the Nevada Subclass)**

124.    Ms. Lomax repeats the allegations in paragraphs 1 – 103 of this Complaint, as if fully alleged herein.

125.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by T-Mobile of failing to use reasonable measures to protect PII.

126.    Various FTC publications and orders also form the basis of T-Mobile's duty.

127.    T-Mobile violated Section 5 of the FTC Act (and similar state statutes, including the Nevada Deceptive Trade Practices Act) by failing to use reasonable measures to protect PII and not complying with industry standards.

128.    T-Mobile's conduct was particularly unreasonable given the nature and amount of PII obtained and stored, the foreseeable consequences of a data breach on T-Mobile's systems, and the multiple prior data breaches of T-Mobile's systems.

129.    T-Mobile's violation of Section 5 of the FTC Act (and similar state statutes, such as the Nevada Deceptive Trade Practices Act) constitutes negligence *per se*.

130.     Ms. Lomax and class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

131.     Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against.

132.     Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of defendants' failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Ms. Lomax and class members.

133.     As a direct and proximate result of T-Mobile's negligence, Ms. Lomax and class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by T-Mobile, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## COUNT III

### *DECLARATORY JUDGMENT*

**(On behalf of Plaintiff and the Nationwide Class or, in the alternative, on behalf of Plaintiff and the Nevada Subclass)**

134.     Ms. Lomax repeats the allegations in paragraphs 1 – 103 of this Complaint, as if fully alleged herein.

135.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.

136. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

137. An actual controversy has arisen in the wake of the Data Breach regarding T-Mobile's present and prospective common law and other duties to reasonably safeguard its users' PII, and whether T-Mobile is currently maintaining data security measures adequate to protect Ms. Lomax's and class members from further data breaches that compromise their PII.

138. Ms. Lomax and class members remain at imminent risk that further compromises of their PII will occur in the future.

139. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. T-Mobile continues to owe a legal duty to secure users' PII under the common law, Section 5 of the FTC Act, and various state statutes, including the Nevada Deceptive Trade Practices Act; and

    b. T-Mobile continues to breach this legal duty by failing to employ reasonable measures to secure Ms. Lomax's and class members' PII.

140. The Court also should issue corresponding prospective injunctive relief pursuant to 28 U.S.C. § 2202, requiring T-Mobile to employ adequate security practices consistent with law and industry standards to protect its users' PII.

141. If an injunction is not issued, Ms. Lomax and class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of T-Mobile.

142. The risk of another such breach is real, immediate, and substantial.

143. If another breach occurs, Ms. Lomax and class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

144. The hardship to Ms. Lomax and class members if an injunction does not issue exceeds the hardship to T-Mobile if an injunction is issued.

145. Among other things, if another data breach occurs at T-Mobile, Ms. Lomax and class members will likely be subjected to fraud, identify theft, and other harms described herein.

146. On the other hand, the cost to T-Mobile of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and T-Mobile has a pre-existing legal obligation to employ such measures.

147. Issuance of the requested injunction will not disserve the public interest.

148. To the contrary, such an injunction would benefit the public by preventing another data breach at T-Mobile, thus eliminating additional injuries that would result to Ms. Lomax, class members, and the tens of millions of other individuals for whom T-Mobile stores and processes PII, and whose PII would be further compromised.

**COUNT IV**

*BREACH OF CONFIDENCE*

**(On behalf of Plaintiff and the Nationwide Class or, in the alternative, on behalf of Plaintiff and the Nevada Subclass)**

149. Ms. Lomax repeats the allegations in paragraphs 1 – 103 of this Complaint, as if fully alleged herein.

150. At all times during Ms. Lomax's and class members' interactions with T-Mobile, T-Mobile was fully aware of the confidential and sensitive nature of Ms. Lomax's and class members' PII.

151. As alleged herein and above, T-Mobile's relationship with Ms. Lomax and class members was governed by terms and expectations that Ms. Lomax's and class members' PII would be collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties.

152. Ms. Lomax and class members provided their respective PII to T-Mobile with the explicit and implicit understandings that T-Mobile would protect and not permit their PII to be disseminated to the public or any unauthorized parties.

153. Ms. Lomax and class members also provided their respective PII to T-Mobile with the explicit and implicit understandings that T-Mobile would take precautions to protect the PII from unauthorized disclosure, such as following basic principles of encryption and information security practices.

154. T-Mobile voluntarily received in confidence Ms. Lomax's and class members' PII with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

155. Due to T-Mobile's failure to prevent, detect, and avoid the Data Breach from occurring by following best information security practices to secure Ms. Lomax's and class members' PII, Ms. Lomax's and class members' PII was disclosed and misappropriated to the public and unauthorized third parties beyond Ms. Lomax's and class members' confidence, and without their express permission.

156. But for T-Mobile's disclosure of Ms. Lomax's and class members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and/or used by unauthorized third parties.

157. The Data Breach was the direct and legal cause of the theft of Ms. Lomax's and class members' PII, as well as the resulting damages.

158. The injury and harm Ms. Lomax and class members suffered was the reasonably foreseeable result of T-Mobile's unauthorized disclosure of Ms. Lomax's and class members' PII.

159. T-Mobile knew its computer systems and technologies for accepting, securing, and storing Ms. Lomax's and class members' PII had serious security vulnerabilities because T-Mobile failed to observe even basic information security practices or correct known security vulnerabilities and because T-Mobile had suffered previous data breaches but did not cure those vulnerabilities.

160. As a direct and proximate result of T-Mobile's breaches of confidence, Ms. Lomax and class members have been injured and were damaged as discussed herein and as will be proven at trial.

161. As a direct and proximate result of T-Mobile's breach of confidence, Ms. Lomax and class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the

compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by T-Mobile, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

**COUNT V**

***BREACH OF IMPLIED CONTRACT***

**(On behalf of Plaintiff and the Nationwide Class or, in the alternative, on behalf of Plaintiff and the Nevada Subclass)**

162.     Ms. Lomax repeats the allegations in paragraphs 1 – 103 of this Complaint, as if fully alleged herein.

163.     Ms. Lomax and class members entered into an implied contract with T-Mobile when they obtained services from T-Mobile, or otherwise provided PII to T-Mobile.

164.     As part of these transactions, T-Mobile agreed to safeguard and protect the PII of Ms. Lomax and class members.

165.     Ms. Lomax and class members entered into implied contracts with the reasonable expectation that T-Mobile's data security practices and policies were reasonable and consistent with industry standards. Under the implied contracts, Ms. Lomax and class members believed that T-Mobile would use part of the monies paid to T-Mobile, or monies it derived from advertising or other use of Ms. Lomax's and class members' PII, to provide reasonable and adequate data security to protect Ms. Lomax's and class members' PII.

166.     Ms. Lomax and class members would not have provided and entrusted their PII to T-Mobile and/or would have paid less in the absence of the implied contract or implied terms between them and T-Mobile. The safeguarding of the PII of Ms. Lomax and class members was critical to realize the intent of the parties' bargain.

167.     Ms. Lomax and class members fully performed their obligations under the implied contracts with T-Mobile.

168. T-Mobile breached its implied contracts with Ms. Lomax and class members by failing to protect their PII. Specifically, T-Mobile (1) failed to use reasonable measures to protect that information; and (2) disclose that information to unauthorized third parties, in violation of the implied agreement.

169. As a direct and proximate result of these breaches of implied contract, Ms. Lomax and class members sustained actual losses and damages as described in detail above, including but not limited to being denied the benefit of the bargain pursuant to which they provided their PII to T-Mobile.

**COUNT VI**

***NEVADA DECEPTIVE TRADE PRACTICES ACT***

*Nev. Rev. Stat. §§ 598.0903 et seq.*

**(On behalf of Plaintiff and the Nevada Subclass)**

170. Ms. Lomax repeats the allegations in paragraphs 1 – 103 of this Complaint, as if fully alleged herein.

171. T-Mobile advertised, offered, or sold goods or services in Nevada and engaged in trade or commerce directly or indirectly affecting the people of Nevada.

172. T-Mobile engaged in deceptive trade practices in the course of its business or occupation, in violation of Nev. Rev. Stat. §§ 598.0915 and 598.0923, including:

(a) Knowingly making a false representation as to the characteristics, uses, or benefits of goods or services for sale in violation of Nev. Rev. Stat. § 598.0915(5);

(b) Representing that goods or services for sale are of a particular standard, quality, or grade when T-Mobile knew or should have known that they are of another standard, quality, or grade in violation of Nev. Rev. Stat. § 598.0915(7);

(c) Advertising goods or services with intent not to sell them as advertised in violation of Nev. Rev. Stat. § 598.0915(9);

(d) Failing to disclose a material fact in connection with the sale of goods or services in violation of Nev. Rev. Stat. § 598.0923(2); and

(e)     Violating state and federal statutes or regulations relating to the sale of goods or services in violation of Nev. Rev. Stat. § 598.0923(3).

173.    T-Mobile's deceptive trade practices in the course of its business or occupation include:

(a)     Failing to implement and maintain reasonable security and privacy measures to protect Ms. Lomax and Nevada Subclass members' PII, which was a direct and proximate cause of the Data Breach;

(b)     Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

(c)     Failing to comply with common law and statutory duties pertaining to the security and privacy of Ms. Lomax and Nevada Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Nevada's data security statute, Nev. Rev. Stat. § 603A.210, which was a direct and proximate cause of the Data Breach;

(d)     Misrepresenting that it would protect the privacy and confidentiality of Ms. Lomax's and Nevada Subclass members' PII, including by implementing and maintaining reasonable security measures;

(e)     Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Ms. Lomax's and Nevada Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Nevada's data security statute, Nev. Rev. Stat. § 603A.210;

(f)     Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Ms. Lomax's and Nevada Subclass members' PII; and

(g)     Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Ms. Lomax's and Nevada Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Nevada's data security statute, Nev. Rev. Stat. § 603A.210.

174.     T-Mobile's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of T-Mobile's data security and ability to protect the confidentiality of consumers' PII.

175.     Had T-Mobile disclosed to Ms. Lomax and Nevada Subclass members that its data systems were not secure and, thus, vulnerable to attack, T-Mobile would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. In spite of its unreasonable data security measures, T-Mobile continued its business and received, maintained, and compiled Ms. Lomax's and Nevada Subclass members' PII as part of the services T-Mobile provided, which Ms. Lomax and Nevada Subclass members paid for, without ever advising Ms. Lomax and Nevada Subclass members that T-Mobile's data security practices were insufficient to maintain the safety and confidentiality of Ms. Lomax's and Nevada Subclass members' PII. Accordingly, Ms. Lomax and the Nevada Subclass members acted reasonably in relying on T-Mobile's misrepresentation and omissions, the truth of which they could not have discovered.

176.     T-Mobile acted intentionally, knowingly, and maliciously to violate Nevada's Deceptive Trade Practices Act, and recklessly disregarded Ms. Lomax and Nevada Subclass members' rights. T-Mobile's past data breaches put it on notice that its security and privacy protections were inadequate.

177.     As a direct and proximate result of Nevada's deceptive trade practices, Ms. Lomax and Nevada Subclass members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach, investigating the nature of the Data Breach not fully disclosed by T-Mobile, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating

fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

178.    Ms. Lomax and Nevada Subclass members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, and attorneys' fees and costs.

## REQUEST FOR RELIEF

**WHEREFORE**, Ms. Lomax, individually and on behalf of all class members proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against T-Mobile as follows:

1) For an Order certifying the Nationwide Class and the Nevada Subclass, as defined herein, and appointing Ms. Lomax and Ms. Lomax's counsel to represent the Class as alleged herein;

2) For injunctive and other equitable relief as is necessary to protect the interests of Ms. Lomax and Class Members;

3) For an award of compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined;

4) For an award of statutory damages and punitive damages, as allowed by law in an amount to be determined;

5) For an award of restitution or disgorgement, in an amount to be determined;

6) For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

7) For prejudgment interest on all amounts awarded; and

8) Such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

## JURY DEMAND

Ms. Lomax, on behalf of herself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED this twenty third day of September, 2021

Respectfully submitted,

KEMP JONES, LLP

*/s/ Don Springmeyer*
Don Springmeyer (NV Bar #1021)
Michael J. Gayan (NV Bar #11135)
3800 Howard Hughes Pkwy., 17th Floor
Las Vegas, Nevada 89169

Sabita J. Soneji (*pro hac vice* forthcoming)
TYCKO & ZAVAREEI LLP
1970 Broadway – Suite 1070
Oakland, California 94612

*Attorneys for Plaintiff and the Proposed Class*